IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| vs.  ) | Case No. 3:23-cr-30099-DWD |
| ) | |
| CHRISTIAN M. CLUBB,  ) | |
| ) | |
| Defendant.  ) | |

**MEMORANDUM & ORDER**

**DUGAN, District Judge:**

Before the Court is Defendant's Motion to Dismiss the Indictment Pursuant to the Second and Fifth Amendments to the U.S. Constitution (Doc. 18), Memorandum in Support of that Motion (Doc. 19), and Supplement to that Motion (Doc. 20) (collectively, "Motion"). The Government filed a Response in Opposition to the Motion (Doc. 24).

The question presented is whether, in light of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), § 922(g)(1) of Title 18 of the United States Code, which prohibits the possession of a firearm by a felon, violates the Second or Fifth Amendments to the U.S. Constitution. U.S. Const. Amends. II & V. For the reasons explained below, the Court **FINDS** § 922(g)(1) does not violate those Amendments.

**I. BACKGROUND**

On August 15, 2023, a single-count Indictment (Doc. 1) was returned against Defendant. The Indictment alleged, in violation of § 922(g)(1), Defendant knowingly possessed a firearm, *i.e.*, a Ruger .380 caliber firearm, despite having previously been convicted of a felony. (Doc. 1, pg. 1). Defendant has multiple felony convictions. More

specifically, in 2012, Defendant was convicted in the Circuit Court of Madison County, Illinois, of burglary, resulting in a sentence of two years of probation. (Doc. 18, pg. 1). Further, in 2016, Defendant was convicted in the Circuit Court of Madison County, Illinois, of residential burglary, resulting in a sentence of 4 years of imprisonment in the Illinois Department of Corrections. (Doc. 18, pg. 1).

Defendant notes his prior felonies are not considered violent under the Armed Career Criminal Act or the career offender provision of the U.S. Sentencing Guidelines. *See, e.g.*, *U.S. v. Haney*, 840 F.3d 472, 475 (7th Cir. 2016); *U.S. v. Glispie*, 978 F.3d 502, 503 (7th Cir. 2020); *U.S. v. Hudson*, 967 F.3d 605, 612 (7th Cir. 2020); (Docs. 18, pgs. 1-2; 19, pg. 13). Defendant argues his possession of a firearm is covered by the plain text of the Second Amendment, and § 922(g)(1)'s prohibition of that conduct is inconsistent with the Nation's historical tradition of firearm regulation. (Docs. 18, pg. 2; 19, pgs. 3-13). *Bruen*, together with *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023), purportedly "support[s] the conclusion that for a defendant whose felonies were not violent, criminalizing the possession of a firearm violates the Second Amendment." (Doc. 18, pg. 2).

Alternatively, Defendant argues criminalizing his possession of a firearm, in light of nonviolent prior felonies, violates the Equal Protection Clause of the Fifth Amendment. (Doc. 18). Defendant clarifies, though, he "should have made explicit…[that] [t]he Fifth Amendment basis for dismissing…[the] Indictment was included simply to preserve that possible issue." (Doc. 20, pg. 1). Otherwise, Defendant concedes the Seventh Circuit "frequently rejects" equal protection arguments related to firearms. (Doc. 20, pg. 1).

The Government disagrees § 922(g)(1), in any way, offends the Second or Fifth

Amendments. The Government argues felons do not fall within the text of the Second Amendment and, even if they did, § 922(g)(1) is consistent with the Nation's historical tradition of categorically prohibiting firearm possession by untrustworthy adherents to the law and of punishing felons with capital punishment or estate forfeiture. (Doc. 24, pgs. 12-31). Even in *Bruen*, the Government argues, "six Justices emphasized that certain firearms regulations—including prohibitions on felons' possession of firearms—remain constitutional." (Doc. 24, pg. 7). According to the Government, this is why the federal judiciary, in approximately 254 separate rulings, has found § 922(g)(1) does not offend the Second Amendment. (Doc. 24, pg. 7). And, notably, the Government argues "the boundaries of the Second Amendment do not rest on an individual, case-by-case determination of the danger each felon poses to public safety," as Defendant suggests with his invocation of the ACCA and sentencing guidelines. (Doc. 24, pgs. 36-37). In any event, though, the Government argues Defendant's criminal record more than supports a finding that he is dangerous, as it reflects a risk to public safety, a disregard for the law, and an inability of society to trust that he will use a firearm responsibly. (Doc. 24, pg. 38).

## II. DISCUSSION

Section 922(g)(1), in part, provides: "It shall be unlawful for any person…who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year…to…possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Section 922(g)(1) does not distinguish between violent felonies and non-violent felonies. *See id*. Nor does the Second Amendment, which provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to

keep and bear arms, shall not be infringed." U.S. Const. Amend. II.

In the last decade or so, much scholarly attention has been paid to the meaning of the words found in the Second Amendment. There is no dearth of recent judicial consideration of both historical and contemporary writings in an effort to understand the import of those words. Given the nature of the analysis required of district courts by *Bruen*, more can be expected. The increase in the number of contests over the constitutionality of § 922(g)(1) is due, at least in part, to the fact that the "means-end scrutiny," such as strict or intermediate scrutiny, does not apply in the Second Amendment context, requiring the Government to affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. *See Bruen*, 597 U.S. at 19. As the Supreme Court emphasized in *Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (citing *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n. 10 (1961)).

While *Bruen* addressed the constitutional right of a citizen to carry a handgun in public, the issue presented—namely, whether a prohibition of the possession of firearms by a felon violates the Second Amendment—is entitled to the same historical analysis. *See Atkinson*, 70 F.4th at 1022 (finding, since the parties did not grapple with *Bruen*, "[t]he best way forward…[wa]s to return the case to the district court for a proper, fulsome analysis of the historical tradition supporting § 922(g)(1)").

4

### A. The Text of the Second Amendment to the Constitution

The Government contests whether Defendant is a person included within the term "people," as used in the Second Amendment. The phrase "the people" is used in notable places in the Constitution, and it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (quoting *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). As emphasized in *Heller*, in all six other provisions of the Constitution mentioning "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. *Id*. Accordingly, there is a "strong presumption that the Second Amendment right is exercised individually *and belongs to all Americans*." *Id*. at 581 (Emphasis added); *see also U.S. v. Ball*, No. 22-cr-449, 2023 WL 8433981, *6 (N.D. Ill. Dec. 5, 2023) ("[N]either *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons. So, while the Supreme Court in both cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not *hold* in either case that 'the people' was limited to law-abiding people.") (Emphasis in original.). The record reflects that Defendant is an American citizen and, therefore, that he is to be afforded the rights available under the Second Amendment despite his status as a felon. *See Ball*, 2023 WL 8433981 at *7 (concluding that felons are not categorically excluded from the plain textual scope of the Second Amendment).

Also, the term "arms," as used in the Second Amendment, includes the Ruger .380 caliber firearm serving as the basis for Defendant's conviction. The 18th Century meaning

5

of "arms" is no different than the meaning today. *See Heller*, 554 U.S. at 581. An "important" legal dictionary from 1771 defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (quoting 1 A New and Complete Law Dictionary; citing N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Handheld firearms date back to as early as the 17th Century and were common during the years of ratification. Clearly, Defendant's Ruger .380 caliber firearm is within the term "arms," as used in the Second Amendment. *See id.* at 582 ("Just as the First Amendment protects modern forms of communications, [citation], and the Fourth Amendment applies to modern forms of search…the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.").

It follows, then, that the Second Amendment presumptively protects the activity of possessing a Ruger .380 caliber firearm, and that finding is consistent with *Heller*. However, § 922(g)(1) excludes from that protected activity those who have been convicted of a crime punishable by more than one year of imprisonment. *See* 18 U.S.C. § 922(g)(1). The potential problem for § 922(g)(1) lies in the fact that its regulation of the Second Amendment right began nearly 200 years after ratification. *See Bruen*, 597 U.S. at 19 (" '[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.' ") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Accordingly, the Government must "demonstrate[e] that it is consistent with the Nation's historical tradition of firearm regulation," and "[o]nly then

6

may [the] court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id*. at 24. (citing *Konigsberg*, 366 U.S. at 50 n. 10).

### B. *Bruen's* Historical Analysis for Justifying the Regulation of Second Amendment Activities

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. And, importantly, "[t]here seems…no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited." *Heller*, 554 U.S. at 595. As alluded to above, whether a regulation interferes with that individual right "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. *Bruen* teaches:

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy…. Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*See id*. at 28-29 (citing C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).

Therefore, historical sources must be sifted through and examined in the search to find reliable indicia of our forefathers' most probable intellectual reactions to the modern regulation or law in question. This process necessarily entails a quarry of analogous, but not entirely identical, legislative artifacts that help to determine the scope of the right, as understood by those who adopted the Amendment. This effort is not without perils, as

"applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins." *Heller*, 670 F.3d at 1275 (Kavanaugh, J., dissenting)).

The history of the right to keep and bear arms—before, during, and after the Founding Era—confirms certain categories of individuals were deemed ineligible to enjoy the right. *See U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pg. 7. English law allowed the disarming of individuals who were "dangerous" or not "peaceable." *See id*. Second Amendment precursors proposed during the Founding Era guaranteed the right only to "honest and lawful" citizens or to those who posed no "danger of public injury." *See id*. Also, 19th Century commentators noted the authority to disarm those who were not "orderly," "peaceable," or "well-disposed." *See id*.

Tradition confirms that reading of the Second Amendment. *See id*. American legislatures have long disarmed individuals who they have found to be dangerous, irresponsible, or otherwise unfit to possess arms. *See id*. For example, during the Revolutionary War, the Continental Congress recommended, and many States adopted, laws disarming loyalists. *See id*. States in the 19th Century disarmed minors, intoxicated persons, and vagrants. *See id*. In addition, Congress in the 20th Century disarmed felons and persons with mental illnesses. *See id*. Although different statutes disqualified different groups at different times, they reflect the same enduring principle: Legislatures may disarm those who are not law-abiding, responsible citizens. *See id*.

In determining the scope of the right to keep and bear arms, a court should consider the right's history and the Nation's tradition of firearm regulation. *See Bruen*, 597 U.S. at 24. History and tradition establish, for example, that the Second Amendment

8

does not guarantee an unlimited right to possess every kind of weapon; rather, Congress may ban "dangerous and unusual weapons." *See Heller*, 554 U.S. at 627 (citing, among other authorities, 4 Blackstone 148-49 (1769); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804); J. Dunlap, The New–York Justice 8 (1815); C. Humphreys, A Compendium of the Common Law in Force in Kentucky 482 (1822); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271–272 (1831); H. Stephen, Summary of the Criminal Law 48 (1840); E. Lewis, An Abridgment of the Criminal Law of the United States 64 (1847); F. Wharton, A Treatise on the Criminal Law of the United States 726 (1852)). If there was anything all the *Heller* Justices agreed upon (and there was not much) it was that the right to keep and bear arms in England was subject to restriction by Parliament. *See id*. at 593, 664-65. History and tradition similarly establish that the Second Amendment does not guarantee an unlimited right to carry weapons in every kind of place; rather, Congress may ban weapons in "sensitive places." *Bruen*, 597 U.S. at 30-31.

Logic would suggest that if Congress can restrict the kind of weapon a citizen may possess and where he might possess that weapon, it may also regulate who may possess weapons in the first place. However, that sort of logic is not enough under *Bruen*. The inadequacy of such logic allows for the making of ambiguous connections between "relevantly similar" regulations instead of showing something more akin to a lineage of "distinctly similar" laws over time. *See id*. at 26-29. Certainly, evidence of the long-held understanding of the meaning of the Second Amendment serves the historical analysis.

The Supreme Court has suggested, at least implicitly, that Congress may disarm

9

individuals who are not "law-abiding, responsible citizens."[1] *See Heller*, 554 U.S. at 635. More specifically, our Supreme Court described the right to keep and bear arms as a "*right* of law-abiding, responsible citizens." *See id*. (Emphasis added). *Heller* also suggests that legislatures may adopt categorical prohibitions on the possession of arms by those who are not law-abiding and responsible, identifying "longstanding prohibitions on the possession of firearms by felons and the mentally ill" as "examples" of "presumptively lawful regulatory measures." *See id*. at 626-27 n. 26. Then, two years after *Heller*, the Court made clear that its holding did not cast doubt on longstanding regulatory measures, such as "prohibitions on the possession of firearms by felons and the mentally ill." *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (7th Cir. 2010); *see also U.S. v. Jackson*, 69 F.4th 495, 498, 501-02 (8th Cir. 2023) (concluding, in light of the assurances in *Heller* and *Bruen* that nothing in those decisions cast doubt on the longstanding prohibitions on the possession of firearms by felons, and the history supporting those assurances, "the district court was correct that § 922(g)(1) [wa]s not unconstitutional as applied to…[the defendant] based on his particular felony convictions [for sale of a controlled substance in the second degree]…[and] there [wa]s no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"); *see also Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) ("Though *Bruen* created a new test for determining the scope of the Second Amendment, the Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons.").

---

[1] *See also Bruen*, generally (identifying many variations of "law abiding, responsible citizens" who enjoy the Second Amendment right).

Even with the Court's implicit expression of its view on the issue of the ability of Congress to restrict the firearm rights of felons, it remains appropriate, at least presently, to look to the history surrounding the Second Amendment's genesis, adoption, and recognized limitations during the Founding Era. *See Bruen*, 597 U.S. at 20-22. Because the Second Amendment "codified a right inherited from our English ancestors," a court should begin with English law. *See id.* at 20 (citing *Heller*, 554 U.S. at 599). Since "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," a court should also consider how those in the Founding Era understood the Second Amendment. *See id.* at 34 (quoting *Heller*, 554 U.S. at 554) (Emphasis omitted). Also, "the public understanding of a legal text in the period after its enactment or ratification" is evidence of that understanding and is appropriately examined. *See id.* at 20 (quoting *Heller*, 554 U.S. at 605) (Emphasis omitted).

Following the Glorious Revolution, the British Bill of Rights codified in 1689 the notion that "the Subjects which are Protestants[] may have arms for their defence suitable to their conditions and as allowed by law." *See Heller*, 554 U.S. at 592-93 (quoting 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689); *accord Bruen*, 597 U.S. at 44-45.[2] Interestingly, as this quotation suggests, whatever right was conferred on English subjects by the Bill of Rights was conferred on only Protestant subjects. Some contend that only the protestants were included because King James II had disarmed "several

---

[2] The Court recognizes that there exists a camp of those with differing views on the origin of our Second Amendment. "If the Americans did grant an individual right to arms, as the United States Supreme Court ruled, they got that idea from someplace other than the 1689 English Bill of Rights." Lois G. Schwoerer, Gun Culture in Early Modern England, pg. 170 (2016).

11

good subjects being Protestants." *See Heller*, 554 U.S. at 664 (Stevens, J., dissenting).

While the Bill of Rights may have prohibited the disarming of "good subjects," it allowed the disarming of "dangerous" ones. The Bill of Rights left intact the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662)). Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly, *e.g.*, those who had "disturbed the public Peace."[3] That practice continued after the adoption of the English Bill of Rights. Indeed, it has been observed that many 18th Century justice-of-the-peace manuals noted the Militia Act authorized local officials to disarm those who were "judge[d] dangerous."[4]

The *Heller* Court determined "[t]his right [conferred by the English Bill of Rights] has long been understood to be the predecessor to our Second Amendment. *See Heller*, 554 U.S. at 593 (citing E. Dumbauld, The Bill of Rights and What It Means Today, pg. 51 (1957); W. Rawle, A View of the Constitution of the United States of America, pg. 122

---

[3]Privy Council to Lord Newport (Jan. 8, 1661), *Transactions of the Shropshire Archaeological and Natural History Society,* pt. 2, 3d ser., vol. 4, at 156 (1904); *See also, e.g., Calendar of State Papers, Domestic Series, Charles II, 1661-1662,* at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670,* at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1, 1684–February 5, 1685,* at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons"); *U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pg. 15.

[4]Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); see, *e.g.,* Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756); *U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pg. 15.

(1825)). So, while the English Bill of Rights conferred a right to possess arms to English subjects, the government could (and did) disarm those who were perceived to be dangerous or who could not be trusted to use arms lawfully. It would seem from these Pre-American Revolution English analogs that the Second Amendment would not necessarily prevent Congress from limiting access to weapons to those who are not dangerous *and* who are law-abiding.

Notably, there is no shortage of Founding Era regulations disarming a group of people who were deemed ineligible to enjoy the right to keep and bear arms. In March 1776, the Continental Congress resolved that the Colonies "immediately cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated or who refuse to associate…against the hostile attempts of the British." 4 Journals of the Continental Congress, 1774-1789, pgs. 201-205 (1906). After ratification, many states promulgated laws addressing the right to bear arms. In 1780, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *See U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States, pgs. 16-17 (quoting *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, pg. 624 (Oscar Handlin & Mary Handlin eds., 1966)). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest and Law-full Subjects of Government we Ought Never to be deprived of them." *See id*. at 17.

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's

13

ratifying convention. They proposed a bill of rights that forbade "disarming the people, or any of them, unless for crimes committed, or real danger of public injury from individuals." *See id*. at 17 (quoting 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976); *Ratification: The People Debate the Constitution, 1787-1788*, pgs. 118-19 (Pauline Maier, 2011). The proposal was defeated, but it was published in the Dissent of the Minority of the Convention, which was widely read and "highly influential." *See id*. (quoting *Heller*, 554 U.S. at 604, 624).

Samuel Adams also proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *See id*. at 17-18 (quoting 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000). A contemporary described the proposal as an effort to protect "the right of peaceable citizens to bear arms." *See id*. at 18 (quoting Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), in 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001)). The convention rejected the proposal, but only because Adams presented it on the morning of ratification. *See id*.

### C. Application to Defendant

The Government, in its Response, outlines a history replete with representative analogues for § 922(g)(1) that sheds light on the scope of the Second Amendment. It conducts a thorough survey of regulations that it believes stand for the proposition that the Second Amendment does not prevent Congress from limiting the firearm rights of felons. (Docs. 24, pg. 18; 24-2). For example, the Government asserts Colonial America disarmed classes of people who were viewed as "untrustworthy" because of concerns

14

that they "were not dependable adherents to the rule of law." (Doc. 24, pgs. 22-23). The Government also points to examples of laws, premised on a failure to demonstrate loyalty, that limited the right to keep and bear arms during the course of the Revolution. (Doc. 24, pgs. 23-25). A 1775 Connecticut law provided that any person convicted of the offense of libeling or defaming any act or resolves of the Continental Congress be disarmed and not be allowed to keep any arms. (Doc. 24, pg. 23). Further, as mentioned above, the Continental Congress recommended, and at least six colonies enacted, laws disarming "those who were 'notoriously disaffected to the cause of America' or who simply 'have not associated' with the colonial governments in the war effort." (Doc. 24, pgs. 23-24). Critically, the Government also analogizes § 922(g)(1) with other felony punishment laws, including those related to nonviolent crimes such as forgery or counterfeiting, that resulted in capital punishment or the forfeiture of one's estate in the American colonies at the time of the founding. *See Jackson*, 69 F.4th at 503 (noting "[e]arly legislatures…authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property."); *Ball*, 2023 WL 8433981 at *11 (recognizing, as the Government argues here, capital punishment and estate forfeiture for felony convictions, including nonviolent felony convictions, were authorized under English law, in many American colonies up to the Founding, and throughout the 18th Century, providing "powerful evidence" that firearm dispossession of felons is a comparable burden to historical punishments for felonies under the *Bruen* framework); (Doc. 24, pgs. 27-31). While certain of these laws might fail against present-day constitutional scrutiny, such laws

15

demonstrate for present purposes the understanding at the time of the Revolution that those who pose a threat to the government, or its people or laws, would be disarmed.

In short, the Government has presented to the Court numerous examples in our history where laws, regulations, and resolutions, denying members of certain groups the right to keep and bear arms, were passed from the times before and during our separating from England, during the colonial periods, and through the Ratification and post-Ratification Eras. Many examples are much more than mere analogues. There are ample "distinctly similar" historical exemplars and models that demonstrate individually, and certainly collectively, that regulations disarming disloyal or even merely untrustworthy individuals were not uncommon in the early history of our Country.[5]

Therefore, the Court finds the Government has carried its burden of showing the Nation's historical tradition of firearm regulation, and even outright prohibition, against the use or possession of firearms by individuals perceived or deemed to be dangerous, untrustworthy, or criminal. *See Bruen*, 597 U.S. at 24; *see also Jackson*, 69 F.4th at 505 ("Whether…[legislatures' traditional employment of status-based restrictions to disqualify categories of persons from possessing firearms is] best characterized as restrictions on persons who deviated from legal norms or [on] persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1)."). With that said, the Court finds that § 922(g)(1) is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms

---

[5]For a thorough examination of the regulations and laws limiting the right to keep and bear arms to "law-abiding" citizens in the 19th and 20th centuries, see *U.S. v. Rahimi*, 2023 WL 5322645, Brief for the United States.

under the Second Amendment, such that it is not unconstitutional either facially or as applied to Defendant. *See id*. at 19; *see also Jackson*, 69 F.4th at 504 (stating, even "if the historical regulation of firearms possession is viewed instead as an effort to address a risk of dangerousness," the prohibition on possession by convicted felons "still passes muster" under the historical analysis, as not all persons disarmed under historical precedents were violent or dangerous and history shows that there is no requirement for an individualized determination of dangerousness because legislatures barred possession based upon the risk of danger of whole classes of people); *U.S. v. Dunn*, 76 F. 4th 1062, 1068 (8th Cir. 2023) (noting, after *Bruen*, "this court concluded that the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)' "); *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting) (recognizing, "the scope of governmental power that was understood to exist at the time the Second Amendment was adopted…allowed the creation of categorical restrictions without any case-by-case escape hatch").[6][7]

Finally, as to Defendant's claim under the Equal Protection Clause of the Fifth Amendment, the Court emphasizes that Defendant "simply [seeks] to preserve that

---

[6] *See U.S. v. Coleman*, No. 22-cr-87, 2023 WL 6690935, *2 (E.D. Virg. Oct. 12, 2023) (observing, as of October 12, 2023, in over 172 cases nationwide, facial and as-applied challenges to the constitutionality of § 922(g)(1) have been rejected under *Bruen's* text-and-history approach); *see also* Exhibit 1 to the Government's Response to Defendant's Motion to Dismiss (Doc. 24-1) (providing a list of federal district court rulings that have upheld the constitutionality of § 922(g)(1) post-*Bruen*).

[7] This Court is not unmindful of the thoughtful dissent of Justice Barrett addressing the dangers of legislatively created groups of citizens whose rights can be marginalized by being summarily included in a broadly defined group: " 'the government does not get a free pass simply because Congress has established a 'categorical ban.' " *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (quoting *U.S. v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)). "The government could quickly swallow the right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun." *Kanter*, 919 F.3d at 465 (citing *U.S. v Skoien*, 614 F.3d 638 at 641).

possible issue." (Doc. 20, pg. 1). Nevertheless, he is correct that the Seventh Circuit has rejected similar claims. (Doc. 20, pg. 1). Particularly notable is the Seventh Circuit's recognition that "Congress enacted § 922(g)(1) 'in order to keep firearms out of the hands of those persons whose prior conduct indicated a heightened proclivity for using firearms to threaten community peace.' " *See U.S. v. Walls*, 225 F.3d 858, 865 (7th Cir. 2000). Therefore, although certain non-violent offenders are exempted from § 922(g)(1), the Seventh Circuit has expressly stated that "differentiation among felons based on the nature of their felonies survives equal protection scrutiny precisely because Congress could reasonably conclude that firearms would pose a higher risk of danger to the public if in the hands of the felons covered by § 922(g)(1)[] than…in the hands of the relatively non-violent" and exempted felons. *See id*. at 865-66; *see also U.S. v. Wilson*, No. 4-2144, 118 Fed. Appx. 974, 977 (7th Cir. Dec. 6, 2004) (concluding the statutory discrimination allegedly caused by § 922(g)(1) did not violate the Equal Protection Clause, where, *inter alia*, the federal government had a rational basis by which to seek to eliminate firearms from the hands of as many criminals as possible while interfering as little as possible with law abiding citizens); *U.S. v. McKenzie*, 99 F.3d 813, 819 (7th Cir. 1996) (concluding the defendant did not show, for purposes of his equal protection claim, Congress was irrational when enacting § 922(g)(1) to "prohibit[] *anyone*, in whatever state they are from, from possessing a firearm if they have been convicted of a crime punishable by a term exceeding one year") (Emphasis added.). In light of these authorities, the Court finds it too must reject Defendant's claim under the Fifth Amendment's Equal Protection Clause.

### III. CONCLUSION

The Court **FINDS** § 922(g)(1) does not violate the Second or Fifth Amendments or, by extension, Defendant's rights, as applied. Accordingly, the Motion is **DENIED**.

**SO ORDERED.**

Dated: January 16, 2024

*/s David W. Dugan*
DAVID W. DUGAN
United States District Judge
